IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**MERLYN JOHNSON and**
**ANTONIO JOHNSON**                                                              **PLAINTIFFS**

**V.**                                                     **CASE NO. 4:08CV17**

**PAUL LEWIS and CENTRAL**
**WOODWORK, INC.**                                                      **DEFENDANTS**

### ORDER

This cause comes before the court on the motion of the plaintiffs to transfer trial of this case to Greenville.

Plaintiffs filed suit in the Greenville Division of the Northern District of Mississippi. The matter was assigned to this court and set for trial in Oxford, seat of the Western Division, as the customary practice in this district is for judges to try cases at their duty station. The plaintiffs wish to move this trial to Greenville pursuant to 28 U.S.C. § 1404(a). The defendants oppose the plaintiffs' motion and request that the trial be held in Oxford.

In *Beck v. Koppers, Inc.*, 2006 WL 2228918 at *1 (N.D. Miss. July 25, 2006), Judge Pepper followed the general practice in the Northern District of denying transfer from his duty station to the division in which the case was filed.[1] The defendants in that action sought a writ of mandamus from the Fifth Circuit in *Beck v. Koppers Inc.*, No. 09-60127 (5th Cir. 2009); No

---

[1] The court notes that *Koppers* had a rather complicated procedural history which may be a reason to distinguish that case from the instant matter. A review of the docket shows that *Koppers* was originally filed in the Western District at Oxford. The case was assigned to Judge Pepper who set it for trial at his duty station in Greenville. Judge Pepper then granted the request of the defendant to move the first in a series of trials to Oxford. Having conducted the first trial in Oxford, Judge Pepper then granted the *ore tenus* motion of the plaintiffs to transfer the remaining trials to Greenville.

1

3:03cv60 (N.D. Miss. 2009). In *Koppers*, the Fifth Circuit found Judge Pepper to have erred in transferring the trial of a case originally filed in the Western Division at Oxford to his "home" court in Greenville.

The *Koppers* panel granted the writ with a one sentence order, lacking any further elaboration. Perhaps the panel was motivated by facts unique to that case, or it may have had concerns regarding practices common to all judges in this district. Realizing that these practices may have been insufficiently described and explained to date, this court will attempt to shed light on them now.

For the last decade, the judges of the Northern District have operated under a series of substantially similar standing orders relating to divisional venue and case assignments which are based upon policy considerations specific to the litigation needs of this district. Legislative history indicates that, since 1988, it has been Congress' intent to permit federal district courts to establish, if they so choose, their own standards relating to divisional venue. Prior to its repeal, the divisional venue statute, 28 U.S.C. § 1393 provided that:

> (a) Except as otherwise provided, any civil action, not of a local nature, against a single defendant in a district containing more than one division must be brought in the division where he resides. (b) Any such action, against defendants residing in different divisions of the same district or different districts in the same State, may be brought in any of such divisions.

Section 1393 was repealed in 1988. Comments found in the U.S. Code Annotated give some guidance as to Congress' intent in doing so:

> Citing the elimination of divisional venue in criminal cases years earlier, that nothing at all seems to have been lost by its erasure, and that the break-up of a district into divisions is not related either to size or population anyway, Congress repealed as well the divisional venue for which § 1393 had provided on the civil side.

> While statutory direction may now be out of the picture, districts that are divided into divisions may still be affected by distinctions between divisions emanating from the court's own rules. *See Moysi v. Trustcorp, Inc.*, 725 F.Supp. 336 (N.D.Ohio, E.D.1989). It was said in *Jordon v. Bowman Apple Products Co.*, 728 F.Supp. 409 (W.D.Va.1990), "that the purpose in repealing § 1393 was not to prohibit divisional venue, but rather not to require it. Where divisional venue is mandated by local rule ... those mandates must be complied with", but if there is no local rule, venue need be set only on a district basis, disregarding divisions.

32A Am. Jur. 2d Federal Courts § 1190 "Venue in multidivision districts" similarly explains that:

> The current version of the general venue statute does not speak in terms of divisions within a district, but rather requires that venue be laid in the proper district. The repeal of 28 U.S.C.A. § 1393 casts some doubt on whether any vitality remains in the concept of divisional venue. However, the purposes of the repeal of divisional venue were to provide the courts with greater flexibility to accommodate the convenience of the parties and promote the efficient delivery of judicial services. The repeal was not intended to act as a prohibition against districts distributing their business by a divisional venue process. . . . If a district lacks local rules concerning divisional venue, a case may be heard in any division within the district with or without the consent of the parties, and a court may transfer a case to another division under 28 U.S.C.A. § 1404(a), which provides for transfers to other divisions.

The repeal of § 1393 provided an opportunity for this court to establish its own standards regarding divisional venue. It also provided a reason for doing so. Section 1393 had limited plaintiffs in multi-divisional districts to filing suit in the division where the defendant resided. With the repeal of this statute, the freedom of plaintiffs to file suit in various divisions within a district increased, as did the potential for mischief in this context.

The potential for shopping for a particular judge or jury has been a matter of long-standing concern among the bench in the Northern District. The judges of this district wish to avoid the perception that one form of justice will be available to litigants filing suit in one division in this district as opposed to those filing suit in another. The judges also wish to avoid a

situation whereby any particular division comes to be seen as a "fiefdom" of sorts, in which the idiosyncrasies and preferences of one judge come to dominate the local litigation practice.

Finally, there is the matter of the named standing divisions in the Northern District as opposed to reality. In 1996, the Clarksdale Courthouse, site of the Delta Division, was closed. Though this courthouse was closed, Mississippi's divisional statute was not amended, *see* 28 U.S.C. § 104, thereby leaving the Northern District with a division without a courthouse. Changes in court facilities have effected other divisional aspects of litigation in this district. For instance, this District has adopted a jury selection plan pursuant to the Jury Selection and Service Act of 1968. 28 U.S.C. § 1863. That plan divides the district into three divisions: Eastern; Western;[2] and Greenville.[3] This three division divide more accurately reflects the federal court facilities and judges located in the Northern District and is supported by statutory authority.

Motivated by these and other concerns, then-Chief Judge Biggers first issued, on July 21, 1999, a standing order publicly filed under case number 3:98MC19, which allocated cases filed in the various divisions among the Northern District judges. On July 2, 2003, then-Chief Judge Davidson issued a substantially similar order, under the same case number, reflecting changes in the makeup of the Northern District judges. On December 3, 2007, this court issued its own such order, likewise providing for allocation of civil cases filed in the Northern District as follows:

Division:         EASTERN         DELTA     WESTERN     GREENVILLE

---

[2] This jury pool division encompasses all the statutorily designated counties of the Western Division plus Desoto, Panola, Quitman, Tallahatchie, Tate and Tunica Counties from the Delta Division.

[3] This jury pool division encompasses all the statutorily designated counties of the Greenville Division plus Bolivar and Coahoma Counties from the Delta Division.

|                    | (Aberdeen) | (Clarksdale) | (Oxford) | (Greenville)[4] |
|--------------------|------------|--------------|----------|-----------------|
| Chief Judge Mills  | 20%        | 30%          | 50%      | 25%             |
| Judge Pepper       | 5%         | 50%          | 15%      | 50%             |
| Judge Aycock       | 50%        | 10%          | 15%      | 25%             |
| Sr. Judge Biggers  | 10%        | 10%          | 10%      | 0%              |
| Sr. Judge Davidson | 15%        | 0%           | 10%      | 0%              |

*In Re: Procedures for the Assignment of Civil Cases*, No: 3:98MC19 (December 3, 2007). The standing order allocates half of the cases filed in a particular division to the "resident" active district judge, dividing the remaining cases among the other judges in the Northern District. In so doing, the order promotes public policy considerations disfavoring forum shopping and also encourages the development of a jurisprudence applicable to the district as a whole.

There is a price to be paid for this approach. That price is that litigants and witnesses are sometimes required to endure longer travel distances than would be the case if a particular district judge only heard cases in his or her own division. While this is regrettable, it has been the view of a succession of chief judges in this district, and is the view of all Northern District judges presently serving, that these burdens are outweighed by the important policy considerations discussed above. This district views the quality and uniformity of justice that is administered in its courtrooms to be more important than the driving distance which litigants face in reaching those courtrooms.

The judges in this district must juggle individual dockets containing hundreds of potential trials. It would be impossible for these judges to efficiently manage their dockets if required to maintain a near-constant state of preparation to travel to various trials on their calender. This is particularly true considering the local practice of "stacking" several trials, likely filed in different

---

[4] The location of the divisions is not included within the court's order. The court has added the geographic designation of the divisions in order to provide clarity as to the infrastructure and travel problems inherent in trying cases only in the division in which they are filed.

divisions, all set to begin on the same date in a particular courtroom. It often does not become apparent until days or even hours before trial which cases will settle and which will proceed.[5] Moreover, there are limitations in the facilities at certain courthouses in this district, and it is likely that these limitations would result in even more delays. For example, neither Greenville nor Aberdeen have a courtroom available for visiting judges and Clarksdale does not even have a courthouse.

Historically, there were four courthouses and two active district judges in this district, thus making the need to travel obvious. This court remembers when Judges Keady and Senter rode the circuit holding trials in all four divisions. At that time the District had more courthouses than judges. The travel schedules of Judges Keady and Senter brought the federal system to every corner of this district. Presently, however, there are three courthouses and three active "resident" judges, along with two senior judges. With five judges and only three courthouses, there is no courthouse in the district that does not frequently host duty station trials. The presence of the federal justice system is felt everyday in every available courthouse in this District.

Additionally, changes in technology and procedures have lessened the need for judges to

---

[5] Consider, for example, a scenario where this court, Judge Aycock and Judge Pepper each had three potential trials set for the upcoming week, with each judge having one potential trial in Aberdeen, Oxford and Greenville. Consider also the possibility that Senior Judges Davidson and Biggers had potential trials set for Aberdeen and Oxford. In such a scenario, the courts and clerks' offices would have to prepare for the possibility that five trials would be set for Oxford and Aberdeen and three for Greenville (which obviously lacks the facilities for such), and the judges' staffs would need to keep abreast not only of the settlement status of their own cases, but also those of four other judges. To avoid such conflicts, the scheduling of cases would have to involve the chambers of up to five judges, and it would become much more difficult for litigants to obtain trial dates. This is not a workable situation. The transfer factors set forth in *In re Volkswagen,* discussed *infra*, place priority on geographical convenience to litigants, but the four private interest factors do not address the fact that, in this district, applying those factors would give rise to serious delays which would greatly inconvenience litigants and slow the administration of justice.

6

travel. The Northern District has adopted electronic filing. The work of attorneys who practice before this court can be done at any location with internet access. The vast majority of all pleadings, motions and orders never require physical attendance at court, greatly reducing the burden on lawyers needing to travel to the courthouse in order to find relief for their clients.

Further, this court randomly assigns Magistrate Judges to each action. Random assignment means that no matter where a case is filed, it could be assigned to a Magistrate Judge whose chambers are in Aberdeen, Greenville, or Oxford. Magistrate Judges in this district conduct case management, settlement, and pre-trial conferences. Thus even if the court moved, for the purposes of trial, all cases to the division in which they were filed, the parties might still have to travel in order to complete the required conferences. Relative to the number of cases in which a case management conference is held, the number of cases that actually proceed to trial is quite small. Thus, the benefit of trying all cases in the division in which they are filed is greatly lessened.

This court does not suggest that its adoption of divisional venue practices means that no circumstances requiring divisional transfer might arise in this district. The Fifth Circuit has held in criminal cases, which similarly lack divisional venue rules, that an intra-district transfer may be required upon "a strong showing of prejudice." *U.S. v. Duncan*, 919 F.2d 981, 985 (5th Cir. 1990). Clearly a "strong showing of prejudice" makes an intra-district transfer necessary and appropriate. This court can discern no unfairness to civil litigants by applying the *Duncan* standard to the civil docket, since a criminal defendant facing trial for his personal freedom faces much higher stakes than any civil litigant. The *Duncan* standard which has proven adequate for criminal defendants should likewise protect the interests of civil litigants.

7

Many attorneys in the Northern District are under the impression that *In re Volkswagen of America, Inc.*, 545 F.3d 304 (5th Cir. 2008) applies to requests for intra-district transfers. Application of that standard to intra-district transfer issues raised in light of a judge's decision to try a case at his duty station would be tantamount to abrogating this court's practice of trying cases at a Judge's assigned duty station. *See Johnson v. City of Columbus*, 1:07cv168, docket entry 67. The *City of Columbus* decision, as discussed below, is consistent with the Fifth Circuit precedents which apply only to inter-district transfers.

In *In re Volkswagen*, the Fifth Circuit set forth private interest factors for courts to consider in ruling upon Rule § 1404(a) motions to transfer, including (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Volkswagen*, 545 F.3d at 315. The first three factors largely involve considerations which, for the reasons discussed above, this court has elected to de-emphasize in the interests of pursuing broader judicial policy goals. The repeal of § 1393 clearly suggests that this court has the authority to pursue these goals. The fourth factor put forth by *In re Volkswagen* is sufficiently broad to encompass the public policies motivating the judges of this district to adopt the current venue rules. However, if the *In re Volkswagen* test is read as nothing more than an algebraic balancing of four equally weighted factors applicable to purely intra-district transfers then it would be impossible for this district to maintain its current practices.

The Fifth Circuit in *In re Volkswagen* also set forth a list of public interest factors to be considered including "'(1) the administrative difficulties flowing from court congestion; (2) the

local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.'" *Volkswagen*, 545 F.3d at 315. It is obvious these public factors have little to do with intra-district transfers. The first factor encompasses one of the traditional policy concerns of the judges in this district. The other three factors are irrelevant.[6] The population of the entire Northern District is less than individual cities encompassed in other districts. The small area and population of the Northern District generally means any controversy in the district concerns the citizens of each of the four divisions. The same judge presides, regardless of the division in which the case is tried. Therefore, familiarity with forum law is not affected by intra-district transfer. The same reasoning holds for the application of foreign law. These last two factors, in fact, only come into play when forums in other states are considered.

It appears that the *Duncan* standard should apply to purely divisional transfer issues in this district, since *In re Volkswagen* involved a transfer outside of a particular judicial district and is thus factually distinguishable. *In re Volkswagen* would clearly be applicable in a case involving a transfer from the Northern District of Mississippi to the Southern District of Mississippi, and it might be applicable to a purely intra-district transfer in a district which had not adopted its own divisional venue practices. In the latter case, there would be no special local rules to consider, and, as suggested in the AmJur2d article quoted above, the general § 1404(a) factors would apply as default rules.

---

[6] The court notes, as is true in the instant case, parties seeking intra-district transfer rarely raise this portion of the test.

The issue in the Northern District, however, is not whether a particular judge made a correct transfer ruling based upon generalized § 1404(a) factors, but whether the district as a whole has the right to establish its own divisional venue standards. The *Duncan* "strong showing of prejudice" standard already applicable in this circuit will continue to serve as a minimal "floor" upon litigants' rights to obtain transfer, notwithstanding any local rule to the contrary.[7] In other cases, however, judicial districts should have the freedom to pursue their own judicial policy objectives tailored to the needs of their districts. The repeal of § 1393 left divisional venue issues to the discretion of district courts. This discretion will be illusory if the judges in this district are required to apply a "one size fits all" approach to venue arising from a decision which arose in a context differing greatly from the present one. The Northern District of Mississippi encompasses a small geographical area with a limited number of judges and facilities in relation to most districts within the Fifth Circuit. Applying the same standards within this district as are imposed on districts with larger populations and geographical areas is inconsistent with the policies which motivated the repeal § 1393.

This court will briefly address certain arguments raised by the defendant in *Koppers*. In seeking mandamus, that defendant relied largely upon 28 U.S.C. § 1404(c), which provides that a "district court may order any civil action to be tried at any place within the division in which it is pending." In the court's view, this provision must be read in light of the repeal of § 1393, and the resulting implicit invitation for district courts to establish their own individualized practices regarding divisional venue. It does not make a great deal of sense to suggest that Congress

---

[7] This is not an indication that a "strong showing of prejudice" is the only instance in which a court may decide transfer to another division is appropriate. On a case-by-case basis each court should determine if facts specific to a particular matter counsel for a transfer. In so deciding the judges in the district would likely consider the factors specified in *In re Volkswagen* as well as other factors such as the timeliness of the request for relief.

would, on the one hand, essentially wash its hands of the divisional venue issue by repealing § 1393, while at the same time maintaining stringent divisional trial venue rules in § 1404. Moreover, while the language of § 1404(c) indicates that district courts may order trials to be held anywhere in the division where suit is filed, it does not indicate that such trials may *only* be held in that division. "May" is the language of discretion.[8] Given that Congress is now indifferent to whether divisional venue rules exist at all, it is inconsistent to suggest that § 1404(c) should be read as expressing an intent by Congress to micro-manage divisional trial venue issues with mandatory rules.

A stringent reading of § 1404(c) is also inappropriate in the Northern District based upon the physical realities. The defendant in *Koppers* relied partly upon 28 U.S.C. § 104(a)(3), which provides as follows:

> (3) The Delta Division comprises the counties of Bolivar, Coahoma, De Soto, Panola, Quitman, Tallahatchie, Tate, and Tunica. Court for the Delta Division shall be held at Clarksdale and Cleveland.

As noted above, there is no federal courthouse in the Delta Division. Thus a stringent application of § 1404(c) is impossible. The Clarksdale courthouse was closed in 1996. Judges in this district can not hear cases in a Federal courthouse within the geographical bounds of the Delta Division. No fair reading of Congressional intent would require Delta Division cases to be stayed until an unplanned courthouse could be built.

In its motion seeking mandamus relief, the defendant in *Koppers* relied partly upon the

---

[8] The court does not wish to indicate judges may arbitrarily decide where to try cases. Quoting Judge Henry J. Friendly, *In re Volkswagen*, shows "that '[e]ven when a statute or rule expressly confers discretion or uses the verb 'may' or some similar locution, there is still the implicit command that the judge shall exercise his power reasonably.'" 545 F.3d at 311(quoting *Indiscretion About Discretion*, 31 Emory L.J. 747, 765 (1982)). Thus, as discussed above, there are instances where it may be out of bounds for a judge to try a case at his or her duty station. However, in most instances trying an action at a judge's duty station is within his or her discretion.

fact that this court has not promulgated policies set forth in its standing order in a formal local rule. This court does acknowledge that AmJur2d and the statutory comments cited above speak in terms of a district adopting a "local rule," and this court has not formally done so. It was the intent of the judges in this district, however, that the standing order would serve as the functional equivalent of a local rule. The standing order was promulgated in the same manner and location as this district's local rules. Moreover, this court has some concerns that the time-consuming process of adopting a formal local rule will diminish the court's flexibility to modify its standing order quickly as the need arises, such as due to the addition or subtraction of a district judge. This court acknowledges, however, that the Northern District might have done a better job of explaining the exact nature of its standing order and that it should have made that order more readily available for public comment. The court does not, however, find this technicality of form to render the standing order void. To this court's knowledge, no party or attorney has complained of a lack of knowledge of the standing order. Every attorney admitted to practice in this district knows the rules laid out by this court. As such, those attorneys are bound by those rules whether put forth by a local rule or a standing order. The standing order at issue in this case is in fact an interim local rule.

At a future date, this court may need to convert its standing order into a local rule or Congress may amend 28 U.S.C. § 104 to bring the jurisdictional statute for the Northern District up to date and consistent with the District's current needs and resources. However, the court finds it unlikely that the Fifth Circuit would conclude that the Northern District has erred in applying its standing order for the last decade. *In re Volkswagen* points out that "[t]here can be no question but that . . . district courts have 'broad discretion in deciding whether to order a

12

transfer.'" 545 F.3d at 311 (quoting *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998)).

A district court's discretion is broad enough that "'[i]f the facts and circumstances are rationally capable of providing reasons for what the district court had done'" that decision will not be reversed. *Id*. at 312 n.7 (quoting *McGraw-Edison Co. v. Van Pelt*, 350 F.2d 361, 363 (8th Cir. 1965)). As such, this court concludes that *Koppers* did not rob the judges of this district of the discretion to try cases at their duty stations and that the "strong showing of prejudice" standard applies to civil cases in this district.

Turning to the facts of this case, the plaintiffs here cite not only inconvenience to witnesses in seeking transfer; they has also submitted affidavits from accident witnesses Cynthia Stevens and Allison Cline in which these witnesses appear to flatly refuse to appear at trial in Oxford. In identically worded-affidavits which were apparently prepared by counsel for plaintiffs, Stevens and Cline assert as follows:

> 4. I am aware that a lawsuit was filed on behalf of Merlyn Johnson and her husband, Antonio Johnson related to the accident and that I will be called as a witness at the trial.
>
> 5. I have learned that the trial of this case is scheduled for August 10, 2009, in Oxford, Mississippi. If required to go to Oxford for the trial, I will have to miss at least 2 days of work and I will have to look for and pay for a place to stay while there. This will create a hardship on me such that I simply cannot do it.
>
> 6. If the trial of this matter were held in Greenville, however, where I live and work, I will certainly be able to appear and testify.

It is unclear whether this court should interpret this statement as an intention to file a motion to quash any trial subpoena issued by this court, and it is further unclear whether this statement originated with the witnesses or with counsel for plaintiffs.

This court's initial review of the law suggests that it would have discretion to deny any

13

motion to quash filed by Stevens and Cline. That is, Fed. R. Civ. P. 45(c)(3)(A)(ii) provides that

> On timely motion, the issuing court **must** quash or modify a subpoena that: (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person – **except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held**;

(emphasis added). Greenville is approximately 115 miles from Oxford, which meets the distance requirement in Rule 45(c)(3)(A)(ii), but, since both cities are located in Mississippi, this court has the authority to order Greenville residents to attend trial in Oxford. This authority is subject to Rule 45(c)(3)(B)(iii), which provides that

> To protect a person subject to or affected by a subpoena, the issuing court **may**, on motion, quash or modify the subpoena if it requires: (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(Emphasis added). The court has no motion to quash before it, and it will therefore not address whether it might choose to quash any trial subpoena issued for Stevens and/or Cline.

It is certainly no coincidence that this issue arises shortly after the Fifth Circuit's decision in *Koppers*. Indeed, the Northern District has seen a flurry of similar motions in the weeks following the Fifth Circuit's decision, even though the travel times and other physical circumstances have obviously not changed. The fact that Greenville residents have managed to do their civic duty for the last decade by testifying in Aberdeen and Oxford raises doubts in this court's mind as to whether good cause to quash any trial subpoena exists in this case. This is particularly true considering that Greenville and Oxford are not merely in the same state but are also in the same judicial district. In the court's view, it is essential that judges be able to enforce trial subpoenas in this district.

14

Even assuming that Stevens and Cline filed motions to quash which were somehow granted, however, any prejudice resulting from their absence would be greatly lessened by the fact that the parties had the opportunity to depose them. Counsel for plaintiffs argues that he would have questioned the witnesses differently if he had known that they would be unavailable for trial. Clearly, however, the issue of whether a deponent might be unavailable at trial is one which any lawyer should consider in deciding how to question that witness. Moreover, nothing prevented counsel from asking Stevens and Cline at their depositions whether they would be able to attend trial. Finally, if it were to be established that plaintiff's counsel had encouraged the witnesses to resist testifying in Oxford, then this would raise obvious estoppel issues in this context. Regardless, the court concludes that plaintiffs have failed to make the strong showing of prejudice required to support transfer, and their motion to transfer will therefore be denied.

It is therefore ordered that plaintiffs' motion to transfer is denied.

So ordered, this the 20th day of July, 2009.

/s/ Michael P. Mills
CHIEF JUDGE
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI